Judge Tiffany G. Chase
Appellant, O'Brien's Response Management Inc. (hereinafter "ORM"), appeals the trial court's judgment granting the Appellee, Center for Toxicology and Environmental *161 Health, L.L.C.'s (hereinafter "CTEH") motion for summary judgment, dismissing with prejudice the third party demand filed by ORM. For the reasons that follow, we reverse the trial court's judgment and remand the matter for further proceedings.
Relevant Factual and Procedural History
On April 20, 2010, the Deepwater Horizon drilling rig exploded, spilling millions of gallons of oil into the Gulf of Mexico. As a result, BP Exploration and Production, Inc., and/or BP America Production Company, (hereinafter "BP") engaged numerous companies to assist in performing response services. Ultimately, thousands of vessels participated. One such entity, Lawson Environmental Service, L.L.C. (hereinafter "Lawson"), was contracted by BP to assist. BP also engaged ORM to provide personnel and oil spill response services.[1] ORM then subcontracted with CTEH, who supplied workers for the cleanup effort. CTEH employed Plaintiff, Nathanial Smith (hereinafter "Smith"), to work as a safety observer. On October 7, 2010, while working aboard the vessel, Captain Cristo (hereinafter "Cristo"), Smith was injured when the Boomer II rear ended the Cristo.[2]
Smith filed a petition for damages alleging claims under general maritime law against Lawson. In response, Lawson filed a third party demand against ORM, seeking indemnification. Although ORM agreed to indemnify Lawson, it filed a third party demand against CTEH, pursuant to a separate contractual indemnity agreement and sought contractual defense, indemnity, and insurance coverage. Smith subsequently reached a settlement and dismissed all claims against all parties with prejudice. Only ORM and CTEH's claims against each other remain.
CTEH filed a motion for summary judgment, seeking a determination that Smith is an employee under 33 U.S.C. § 901 et seq. , the Longshore Harbor Workers' Compensation Act (hereinafter "LHWCA"), and requesting that the indemnity agreement between ORM and CTEH be declared void.[3] After taking the matter under advisement, the trial court granted CTEH's motion for summary judgment, finding Smith was an employee under the LHWCA and dismissed ORM's third party demand. In the trial court's reasons for judgment, it concluded that Smith failed to meet the requirements to qualify as a Jones Act seaman for the following reasons: (1) Smith did not contribute to the function of the vessel; (2) Smith was not a Jones Act seaman connected to a fleet of vessels under common control of the U.S. government; (3) Smith had no substantial connection to the vessel in duration and nature, based upon Smith's statement "that his work as a safety observer was done on the beaches that were being cleaned." This appeal followed.
Applicable Law
An appellate court reviews a trial court's disposition on a motion for summary judgment using the de novo standard of review. Navarre v. Kostmayer Const. Co., Inc. , 2010-0490, p. 2 (La.App. 4 Cir. 11/24/10), 52 So.3d 921, 922. Summary judgment "is designed to secure the just, speedy, and inexpensive determination of every action."
*162 La. C.C.P. art. 966(A)(2). Therefore, after adequate discovery, "a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3). Initially, the burden of proof rests with the mover. La. C.C.P. art. 966(D)(1). Once the mover presents prima facie evidence that there is no genuine issue as to material fact, the burden shifts to the nonmoving party. Atkinson v. Harbor Homeowners Ass'n, Inc. , 2016-1141, p. 5 (La.App. 4 Cir. 5/24/17), 221 So.3d 185, 188.
Both the LHWCA and the Jones Act were developed to provide compensation coverage to maritime employees injured during the course and scope of their employment. Orgeron v. Avondale Shipyards, Inc. , 561 So.2d 38 (La.1990). Both statutes offer mutually exclusive recovery procedures. Id. at 40-41. Accordingly, factual disputes often arise regarding which statute applies. Notably, the Jones Act requires a more heightened burden than that needed to qualify as a LHWCA employee. While the term "seaman" is not defined in the Jones Act, the United States Supreme Court in Chandris, Inc. v. Latsis , 515 U.S. 347, 368, 115 S.Ct. 2172, 2190, 132 L.Ed.2d 314 (1995), articulated a two part test. To find Smith was a seaman under the Jones Act, the evidence must demonstrate: (1) the employee's duties contributed to the function of the vessel or to the accomplishment of its mission; and (2) the employee must have a connection to a vessel in navigation, or to an identifiable group of such vessels, that is substantial in both duration and nature. Id. The purpose of the Jones Act test is to limit recovery under the Act to employees whose work "regularly expose[s] them to the perils of the sea." Id. "Jones Act coverage should not be withheld because the vessels are not under the employer's common ownership or control, when claimants are continuously subjected to the perils of the sea and engaged in classical seaman's work." Wisner v. Prof'l Divers of New Orleans, 98-1755 (La. 3/2/99), 731 So.2d 200, 203. Further, "[t]he duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time." Chandris , 515 U.S. at 370, 115 S.Ct. at 2190-91. The general rule for making this determination is that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman. This figure is only a guideline that allows a court to take the question from the jury when a worker has a clearly inadequate temporal connection to the vessel." Id. at 349, 115 S.Ct. at 2180. Even if a maritime employee's assignment on a vessel is brief, that fact alone does not preclude seaman status. Id. at 372, 115 S.Ct. at 2191-92. "[S]eaman status ... should not be some immutable characteristic that maritime workers who spend only a portion of their time at sea can never attain." Id. , 115 S.Ct. at 2192.
The determination as to seaman status is a mixed question of law and fact. Waller v. Am. Seafoods Co. , 97-0302, p. 2 (La.App. 4 Cir. 10/1/97), 700 So.2d 1306, 1307. Thus, the inquiry is inherently fact specific, depending on the particular circumstances of each case. Id. , p.3, 700 So.2d at 1308. Additionally, a court's interpretation of statutory terms is a question of law. Id. , p. 2, 700 So.2d at 1307. If reasonable persons applying the proper legal standard could differ as to seaman status, it then becomes a question for the trier of fact. Id. , p. 2, 700 So.2d at 1307-08. Only when it can be said that the undisputed facts demonstrate *163 a "maritime worker has a clearly inadequate temporal connection to the vessel, may the court take the question away from the jury." Id. , p. 2, 700 So.2d at 1308 (Emphasis supplied).
Discussion
The issue before this Court is whether the trial court erred in granting summary judgment, finding that Smith's employment falls under the LHWCA rather than the Jones Act. In its motion for summary judgment, CTEH argues ORM's potential recovery against it for contractual defense, indemnity, and insurance coverage is contingent on Smith's status as an LHWCA employee or a Jones Act seaman.[4] CTEH contends the trial court was correct in granting summary judgment and dismissing ORM's third party demand because the undisputed facts prove Smith was an employee under the LHWCA as a matter of law. According to CTEH's theory of the case, Smith qualifies as an employee under the LHWCA for two reasons. First, there were no facts to suggest Smith worked on a fleet of vessels under common ownership or control. Lawson chartered both the Cristo and the Boomer II. Further, CTEH attached deposition testimony of their employee, Smith, who stated that his assignment to the Cristo was controlled by the Cristo alone. Second, CTEH argues that Smith did not have a substantial connection in duration and nature to a vessel. To support these arguments, CTEH notes Smith worked only one day aboard the Cristo, falling far below the required thirty percent threshold needed to establish seaman status. The vessels Smith worked on were not under common control, according to CTEH's theory; thus, only the one day Smith worked on the Cristo should be used in determining how much time Smith worked on vessels. According to the timesheets for Smith, he worked aboard numerous vessels for nineteen days and worked on land eighteen days. Since CTEH calculates that Smith spent only six percent of his time on the Cristo, CTEH argues he could not qualify as a seaman as a matter of law.
In opposition to CTEH's motion, ORM maintains there are material factual disputes regarding whether Smith worked on a fleet of vessels under common ownership or control. In support, ORM produced an affidavit of ORM's CEO Tim Whipple (hereinafter "Whipple"); Smith's deposition testimony and Smith's timesheets.[5] Whipple attested that ORM and its subcontractors were at all times subject to the authority of the U.S. government, through the incident command system and the federal *164 on-scene coordinators. Whipple noted that "response efforts followed the specific instructions relayed in the incident action plans, which contained detailed instructions concerning the authorized response activities that were to occur each day and which were approved by the federal on-scene coordinators, representatives and/or other federal officials at all times."[6] In Smith's deposition, he testified that "it wasn't his business to know actually what company owned which boats. I was there just to be a safety observer." ORM attached the joint stipulations of fact submitted in In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico . MDL 2179, 2016 WL 614690, at 9 (E.D. La. Feb. 16, 2016) (unpublished), which it argues demonstrated ultimate control of the vessels rested with the U.S. government for all response activities.[7] ORM maintains vessel ownership is irrelevant; rather the determinative issue is control.
ORM also contends that Smith met the thirty percent threshold, noting the threshold is only a guideline, as the unique facts of each case control the ultimate determination. According to ORM, Smith's deposition testimony and timesheets prove he worked aboard vessels for nineteen days, or over thirty-nine percent of his employment with CTEH. Specifically, Smith's timesheets reflected the time spent on the water each day, which supported his deposition testimony that he worked about forty percent of the time aboard vessels. Finally, Smith's deposition testimony was that he served aboard hundreds of vessels as a safety observer in the water, demonstrating a sufficient connection to vessels for seaman status.
Based upon our review of the record, we find there is a genuine issue of material fact regarding the applicable maritime workers' statute under which Smith falls. Factual inferences on these issues are germane to the issue of seaman status. Thus, it requires the weighing of evidence which is improper on a motion for summary judgment. Becnel v. Chet Morrison, Inc. , 2010-1411, pp. 14-15 (La.App. 4 Cir. 8/31/11), 73 So.3d 1002, 1010. Different factual inferences could be drawn by the trier of fact regarding who controlled the vessels. The only evidence CTEH submitted in support of their argument that each *165 vessel ultimately controlled operations for the day, was the deposition of Smith, which offered little insight. ORM offered Whipple's affidavit, which attested the U.S. government ultimately controlled the mission, which creates a genuine issue of material fact. Further, the question of which entity ultimately controlled the vessels upon which Smith worked necessarily touches upon the appropriate method to calculate Smith's total time spent aboard vessels. Therefore, the record before this Court does not provide the necessary undisputed facts as to Smith's seaman status which would justify the grant of summary judgment.
Conclusion
There is a genuine issue of material fact as to Smith's status as a seaman under the Jones Act or under the LHWCA. Accordingly, we reverse the judgment of the trial court granting summary judgment in favor of CTEH and remand the matter for further proceedings consistent with this opinion. Finding that the trial court erred in granting summary judgment, we pretermit discussion of ORM's additional assignments of error.
REVERSED AND REMANDED

ORM is an organization which provides emergency preparedness and response management services to the oil industry.

Lawson chartered both the Cristo and the Boomer II to assist in cleanup.

CTEH argues that the indemnity agreement violated 33 U.S.C. § 905(b).

CTEH appears to concede that reasonable minds could differ regarding Smith's contribution to the vessel's mission, focusing their argument on whether Smith served on a fleet of vessels under common ownership or control.

CTEH objected in their reply brief, and at the hearing, to the affidavit. The trial court received it into evidence, subject to the objection, but did not exclude it from consideration or deem it inadmissible. In Moridani v. Stone Clinical Laboratories, LLC., 2017-0519, (La.App. 4 Cir. 11/22/17), 231 So.3d 803, the appellant argued that a trial court's failure to specifically address an objection to documents submitted in support of a motion for summary judgment under La. C.C.P. art. 966(D)(2) constituted reversible error. La. C.C.P. art. 966(D)(2) provides that: "[a]ny objection to a document shall be raised in a timely filed opposition or reply memorandum. The court shall consider all objections prior to rendering judgment. The court shall specifically state on the record or in writing which documents, if any, it held to be inadmissible or declined to consider." In Morindani, like in the case sub judice, an objection was made on the record to documents submitted on the summary judgment motion. However, in both cases, the trial court failed to state on the record, or in writing, that any of the documents submitted were inadmissible or would not be considered. This Court in Morindani found that the appellant's objection to the documents submitted in support of the motion for summary judgment were without merit, thus the trial court was not required to make any specific statements regarding their admissibility. Specifically, the Morindani court noted that the "if any" language in La. C.C.P. art. 966(D)(2) only requires the trial court to address the admissibility of documents if it deems the documents inadmissible or otherwise declined to consider them. In the case sub judice, CTEH argues that the affidavit is inadmissible because Whipple does not have personal knowledge, as required by La. C.C.P. art. 967. However, Whipple, the CEO of ORM indicated he is familiar with the records and business of ORM and, as CEO, would have personal knowledge of the business operations. In his affidavit, he attested that vessels were ultimately subject to the authority of the U.S. government. Whipple, in his capacity as the CEO of ORM "had the requisite knowledge to attest to the contents of his affidavit." Chavers v. Bright Truck Leasing , 2006-1011, p. 8 (La.App. 3 Cir. 12/6/06), 945 So.2d 838, 845.

The Clean Water Act, 33 U.S.C.§ 1321, addresses the chain of command in oil spill emergencies like the Deepwater Horizon. 33 U.S.C.§ 1321(2)(A) provides that the "President shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."

In re Oil Spill by the Oil Rig"Deepwater Horizon" , the court noted that the federal on-scene coordinator retained ultimate decision-making power during the cleanup response, with no action to be taken without approval of the federal on-scene coordinator. MDL 2179, 2016 WL 614690, at 8 (E.D. La. Feb. 16, 2016) (unpublished).